**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0060n.06
Filed: January 27, 2009

**No. 07-2451**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Plaintiff-Appellee, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| v. | ) | |
| | ) | |
| BARRY HUMPHRIES, | ) | **O P I N I O N** |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:     **MARTIN and McKEAGUE, Circuit Judges; COLLIER, Chief District Judge.**[*]

**CURTIS L. COLLIER, Chief District Judge.**   Defendant-Appellant Barry Humphries appeals (1) the denial of his motion to suppress evidence gleaned from a search of his vehicle and (2) his 15-year sentence for being a felon in possession of a firearm.  Because we conclude the search was properly conducted, and because this Court's precedent supports Humphries's sentence, we **AFFIRM** the district court.

**I.**

On June 21, 2003, Humphries and his friend, Nicky Crain, drove into Detroit to attend a concert.  After they entered downtown Detroit, Humphries took a wrong turn and wound up at the corner of Randolph Street and Jefferson Avenue, between the Detroit landmarks of the Renaissance

---

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

Center and the Old Mariners' Church. Humphries turned right onto Randolph Street; at this point, a driver would have seen the road curve off to the right and would have seen signs marking the entrance of the Detroit-Windsor Tunnel leading to Canada.

At some point after turning onto Randolph Street, Humphries and Crain were approached by Customs and Border Patrol ("CBP") officer Greg Latosynski, though the parties disagree about exactly where this encounter occurred. At a hearing on Humphries's motion to suppress evidence of a search, Humphries and Crain testified they were approached while their vehicle was on Randolph Street next to the Old Mariners' Church, apparently before making the right-hand curve toward the toll booths and customs and immigration inspection area. Latosynski, on the other hand, testified the vehicle was much further toward the toll booths, in a shadowy area next to the booths, past the "line of demarcation" shown by a change in pavement color and "just short of the international border crossing." This was important, Latosynski testified, because cars arriving in that position have "made somewhat of a commitment to go to Canada."

Latosynski testified when he approached the vehicle, he saw Humphries displaying "classic nervousness signs" and a great deal of hand movement. Humphries had a cigar in his hand which, to Latosynski, appeared to have been slit open. Latosynski testified this is a typical method of hiding marijuana from law enforcement. Latosynski also observed what appeared to be marijuana particles on Humphries's lap. Based on his observation and suspicion of Humphries, Latosynski ordered Humphries to pull into a secondary inspection area; once there, he had Humphries and Crain exit the vehicle. CBP agents asked both men to empty their pockets onto the hood of the vehicle, and Humphries removed a small bag of marijuana. Humphries and Crain were taken into an adjoining office while CBP agents performed a canine search of the car. During the search, an officer

announced he had found a gun in the vehicle. Humphries and Crain were handcuffed and arrested. While waiting in the detention area, Humphries admitted to another officer the gun was his.

Humphries was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). His potential sentence was enhanced under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), because the government alleged three prior convictions for a violent felony or a serious drug offense.

On January 4, 2007, the district court conducted an evidentiary hearing on Humphries's motion to suppress evidence of the firearm. The court heard testimony from Humphries, Crain, Latosynski, and other CBP officers. The district court denied the motion to suppress by memorandum opinion and order. The court determined that even if Humphries turned into the border crossing area by mistake, "he did end up in a reasonably extended geographic area in the immediate vicinity of a border crossing, only several hundred feet from the entrance to the Detroit-Windsor Tunnel." The CBP officers were conducting lawful stops within the border area and had a lawful right of access to and seizure of Humphries's car, according to the district court.

After the adverse ruling on his suppression motion, Humphries pleaded guilty at a hearing on May 29, 2007. At his sentencing hearing on November 27, 2007, Humphries objected to the use of two 1991 Michigan convictions for delivery/manufacture of less than 50 grams of cocaine which, in addition to a 1985 conviction for larceny from a person, triggered the ACCA and Humphries's sentencing enhancement. Specifically, Humphries argued the 1991 convictions did not fall within the *Almendarez-Torres* exception to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because (1) he questioned the continuing validity of *Almendarez-Torres* after Justice Thomas's opinions in *Apprendi* and *Shepherd v. United States*, 544 U.S. 13 (2005), and (2) *Almendarez-Torres* excepts

-3-

from *Apprendi* the fact of a prior conviction, but Humphries contested the facts *about* a prior conviction because the Government did not prove the offenses were committed on occasions different from each other. That, argued Humphries, should be submitted to a jury under *Apprendi*.

The court, after hearing the Government's argument, denied Humphries's objection and sentenced Humphries to the 15-year statutory mandatory minimum. Humphries filed this timely appeal alleging the district court erred (1) by admitting the evidence of his gun over his motion to suppress, and (2) in applying the ACCA sentence enhancement because the facts about Humphries's prior convictions should have been submitted to a jury.

## II.

In reviewing motions to suppress, we examine factual findings for clear error and review legal conclusions about the existence of probable cause de novo. *United States v. Combs*, 369 F.3d 925, 937 (6th Cir. 2004). When a lower court denies a suppression motion, we must review the evidence in the light most favorable to the Government. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998). Additionally, to the extent the district court made credibility determinations at the suppression hearing, we afford those determinations deference because the district court was in the best position to make them. *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999).

As for Humphries's ACCA argument, "[s]ince determining whether the conduct was a single occasion or multiple occasions presents a legal question concerning the interpretation of a statute, we review the district court's decision de novo." *United States v. Murphy*, 107 F.3d 1199, 1208 (6th Cir. 1997).

## III.

### A.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Thompson v. Louisiana*, 469 U.S. 17, 19–20 (1984) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). However, because of our Government's need to protect national security, "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004); *see also United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985) ("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country."). This exception to the Fourth Amendment's warrant requirement applies not just at borders, but also at their "functional equivalents." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73 (1973). Examples of functional equivalents include "an established station near the border, at a point marking the confluence of two or more roads that extend from the border," or an airport customs station. *Id.* at 273. The Ninth Circuit has held "[t]he term 'border' logically includes the check point at the port of entry as well as a reasonable extended geographic area in the immediate vicinity of any entry point." *United States v. Mejias*, 452 F.2d 1190, 1193 n.1 (9th Cir. 1971).

In this case, the border search issue centers on a factual dispute between Humphries and the Government. At the evidentiary hearing, the Government's witnesses, and Latosynski in particular, testified Humphries's car was right next to the station where cars are inspected before entering the tunnel. Humphries and Crain testified their car was (at most) a few hundred feet further away. Though Humphries claims Latosynski's testimony is uncorroborated, the district court chose to credit

-5-

the testimony of the Government's witnesses over that of Humphries and Crain.

Humphries cannot prevail on this challenge because on appeal of the district court's denial of a motion to suppress, we view the evidence in the light most favorable to the Government, *Erwin*, 155 F.3d at 822, and the district court's credibility determinations receive great deference, *Hill*, 195 F.3d at 264–65. In this case, the district court simply found CBP agents' testimony more credible on the issue of where Humphries's car was stopped when the agents first encountered Humphries. The district court found that, even if inadvertently, Humphries and Crain had entered an area where cars stopped in line to exit the country, and that CBP agents were permissibly conducting searches of outbound vehicles in that area. Though the actual border between the United States and Canada is located somewhere in the middle of the Detroit-Windsor Tunnel, the area where Humphries and Crain were stopped was acting as a functional equivalent of the border, and warrantless, suspicionless searches were permissible there under *Almeida-Sanchez*.

We have extended the rationale underlying the suspicionless search of persons and effects *entering* the country to situations where persons or articles attempt to *exit* the country as well. *United States v. Boumelhem*, 339 F.3d 414 (6th Cir. 2003). In *Boumelhem*, we upheld, under the border exception, the search of a cargo container which was sitting in a railroad yard waiting to be shipped overseas. *Id.* at 422. Though the weapons discovered by the search did not pose an immediate danger since they were not entering the country at that time, we nevertheless approved the exit search because it "implicate[d] the sovereign's interest in protecting itself" from dangerous weapons re-entering the country. *Id.* at 422–23. We further justified the exit search because "travellers (or exporters) undoubtedly have a lesser expectation of privacy when they (or their goods) leave the country if for no other reason than the departure from the United States is almost invariably

followed by an entry into another country which will likely conduct its own border search." *Id.* at 423 (quoting *United States v. Oriakhi*, 57 F.3d 1290, 1302 (4th Cir. 1995) (Phillips, J., concurring)). Defendant Ali Boumelhem did "not challenge the district court's finding that the search of the container took place at the functional equivalent of the border. Nor [did he] argue that the search was a physically intrusive, 'non-routine' search, which would require reasonable suspicion." *Id.* at 421 n.3.

Here, in contrast to Boumelhem, Humphries does argue his search was too attenuated from the border or its functional equivalent to qualify under the border search exception. Yet the district court found Humphries's vehicle ended up "in a reasonably extended geographic area in the immediate vicinity of a border crossing." To reiterate, we review the district court's factual findings in a suppression hearing under the clear error standard. *Combs*, 369 F.3d at 937. Examining the photographs and aerial maps submitted as part of the record, and accepting the Government's version of events as true (as we must, *Erwin*, 155 F.3d at 822), we cannot conclude the district court committed clear error in finding Humphries had crossed over a line that marked the border area, where inspections by CBP officers were a matter of routine. Humphries's vehicle had passed over the "line of demarcation" shown by a change in pavement color (assuming this is a legally meaningful designation), placing him within the area where cars normally lined up to undergo inspection before proceeding into Canada. In this case, therefore, Humphries's vehicle was close enough to the border, or its functional equivalent, to fall squarely within the border search exception.[1]

---

[1] It is worth pointing out, however, that a case with sufficiently different facts might not be covered by the border search exception. The primary purpose for this exception, which allows warrantless, suspicionless searches, is to seize contraband and "stop[] and examin[e] persons and property crossing into this country." *Flores-Montano*, 541 U.S. at

Given, then, the deference owed to the district court's findings of fact, we find that court did not err when it determined Humphries's vehicle was properly searched under the border search exception to the Fourth Amendment. Accordingly, we affirm the district court's denial of Humphries's motion to suppress.[2]

**B.**

Humphries next argues the district court improperly found his two prior drug offenses were committed on occasions different from one another. He submits that because this was a finding which enhanced his statutory maximum sentence under the ACCA,[3] it should have been submitted to the jury and proved beyond a reasonable doubt. He also urges the Sixth Circuit to reconsider its

152 (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)). The exception's source lies in the powers of the "sovereign to protect itself" by conducting these suspicionless searches, which become "reasonable simply by virtue of the fact that they occur at the border." *Id.* at 152–53.

This case, by contrast, involves a search covering a possible exit from the country. While this is generally permissible, *Boumelhem*, 339 F.3d at 421–22, it is subject to limits because "the application of the border search exception to articles or persons leaving the country" must depend on a balance between the "intrusion on the individual's Fourth Amendment interests against [law enforcement's] promotion of legitimate governmental interests," *id.* (citing *Montoya de Hernandez*, 473 U.S. at 537).

Courts must be more cautious when dealing with searches beyond the "functional equivalent" of a border, *Almeida-Sanchez*, 413 U.S. at 272–73, because the Government's interest necessarily recedes with distance from the border—particularly with American citizens who arguably are not even planning to use the border—as such police activity begins to more closely resemble general crime prevention than protection of the Nation's borders. The border search exception allows for warrantless, suspicionless searches and thus its application must remain tethered to its primary purpose. This case involves a "border" located in a major American city's downtown, and nothing in this decision should be read to derogate Fourth Amendment principles which are otherwise applicable.

[2]Humphries also argued that the search was not justified under the plain view exception to the warrant requirement. We find it unnecessary to reach the plain view issue, however, because the border search exception justifies the CBP agents' search.

[3]The ACCA provides, in relevant part:

In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years . . . .

18 U.S.C. § 924(e)(1).

holding in *United States v. Burgin*, 388 F.3d 177 (6th Cir. 2004), in light of *Shepard*, which recognized a distinction between the fact of a prior conviction and facts *about* a prior conviction. The Government responds that *Burgin* is well-settled precedent which affirms that the fact of a prior conviction is a sentencing factor falling squarely under the *Almendarez-Torres* exception to *Apprendi*.

Generally, any facts which could elevate a defendant's sentence beyond the statutory maximum must be submitted to the jury, not a judge, and proven beyond a reasonable doubt. *Apprendi*, 530 U.S. at 476. However, *Apprendi* preserved an exception for the fact of a prior conviction, which may still be found by a judge at sentencing by a preponderance of the evidence. *Id.* at 490. This exception is grounded in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998) (the "*Almendarez-Torres* exception"), which held earlier convictions are properly considered sentencing factors, not elements of the crime, because they go to recidivism, which is "as typical a sentencing factor as one might imagine," *id.* at 230. However, *Almendarez-Torres* was intended to be an "exceptional departure" only for the prior commission of a serious crime. 530 U.S. at 487. Its holding is restricted to recidivism because that "is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence." *Id.* at 487–88 (quoting *Jones v. United States*, 526 U.S. 227, 249 (1999)).

In *Burgin*, the defendant challenged the use of two state court convictions which triggered the ACCA, claiming they occurred within days of each other and should have been counted as one course of conduct. 388 F.3d at 180. He argued the "different occasions" language of § 924(e)(1) was a fact other than the fact of a prior conviction, and should have been submitted to the jury under *Apprendi*. *Id.* at 183. We rejected this argument, holding that

determinations by a district court that prior felony convictions exist and were committed on different occasions, are so intimately related that the "different occasions" requirement of § 924(e) sufficiently comes within the exception in *Apprendi* for a prior conviction. Thus, it is our determination that this issue need not be pled in an indictment, submitted to a jury, and proved beyond a reasonable doubt. The "different occasions" language involves the issue of recidivism, "a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence." Like the fact of a prior conviction, it is not a fact that pertains to the commission of the offense for which the defendant is presently charged. Thus, the "different occasions" requirement of § 924(e) cannot be significantly distinguished from "the fact of a prior conviction."

*Id.* at 186 (internal citation omitted).

Humphries's case bears a strong factual resemblance to *Burgin*. Humphries, like Burgin, pleaded guilty to violating 18 U.S.C. § 922(g) and the district court determined his serious drug offenses were committed on different occasions from one another. Both defendants' criminal histories made them candidates for application of the ACCA. And both district courts held sentencing hearings in which they acknowledged the defendants' objections to treating the offenses separately, but ultimately overruled the objections and gave the defendants the minimum sentences allowed by the ACCA.

Humphries argues that other opinions subsequent to *Apprendi* have strengthened its rationale and have called the *Almendarez-Torres* exception into question. He contends a "significant possibility now exists that a majority of the Supreme Court would vote, in the appropriate case, to overturn *Almendarez-Torres*." Appellant's Br. at 31. Further, he argues the Supreme Court's decision in *Shepard* made an analytic distinction between the fact of a prior conviction and facts *about* a prior conviction (the latter of which must be submitted to a jury and proved beyond a reasonable doubt), a distinction which undermines *Burgin*.

In previous cases, we have made clear beyond peradventure that even "[p]ost-*Booker*, we

continue to rely on *Burgin*." *United States v. Smith*, 474 F.3d 888, 892 (6th Cir. 2007); *see also United States v. Powers*, 129 F. App'x 942, 946–47 (6th Cir. 2005) (recognizing *Burgin*'s binding precedential value after *Booker* and *Shepard*). We have also cited approvingly to *Burgin* in a post-*Booker*, non-ACCA case involving the district court's determination of whether prior convictions were related. *United States v. Alford*, 436 F.3d 677, 681 (6th Cir. 2006). And we relied on *Burgin* in holding a judge could determine whether a prior offense was a crime of violence. *United States v. Hollingsworth*, 414 F.3d 621, 623 (6th Cir. 2005). Moreover, nothing in *Blakely* or *Booker* suggests those cases overrule the *Almendarez-Torres* exception; on the contrary, both cases expressly reaffirmed *Apprendi*'s holding *and* its exception for a prior conviction. *See Booker*, 543 U.S. at 244; *Blakely*, 542 U.S. at 301. It is clear to us that *Burgin* remains binding precedent in this Circuit, notwithstanding any changes in the law occasioned by later cases addressing sentencing issues.

As for *Shepard*, Humphries's reliance on it is limited to Justice Thomas's statement, in a concurrence, that he would reconsider the *Almendarez-Torres* exception. 544 U.S. at 27–28 (Thomas, J., concurring in part and concurring in the judgment). The majority opinion, by contrast, did not say *all* facts about prior convictions should be subject to *Apprendi*; it only concerned itself with those pertaining to the factual basis of the prior plea—that is, the documents used in lower court proceedings such as police records. *Id.* at 25 (majority opinion). The majority emphasized its holding did not exclude all facts about prior convictions, including the fact a certain conviction was committed on a certain date. *See id.* at 26 n.5. As such, *Shepard* does not overrule *Burgin*'s approval of a court's finding that convictions were committed on "different occasions" to trigger the ACCA.

Thus, Humphries cannot overcome the binding precedent that *Burgin* sets forth for determining facts of a prior conviction. The district court properly followed this precedent, and accordingly, we will not disturb its finding that Humphries was convicted of two separate violent felonies in 1991, in addition to his 1985 conviction, and thus became eligible for the ACCA's mandatory minimum sentence.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's denial of Humphries's motion to suppress. We also **AFFIRM** the district court's application of a sentencing enhancement under the ACCA.